Opinion issued October 26, 2006 














Opinion
issued October 26, 2006










 

 

 

 

 














 

     

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 


 



NO. 01-05-00714-CR




 
 
 
 
 
 
 


 

 



ERIK VELAZQUEZ AYALA, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 23rd District Court

Brazoria
 County, Texas

Trial Court Cause No. 46364

 








 



MEMORANDUM OPINION

          Erik Velazquez Ayala pleaded not
guilty to the charge of the murder of Javier Martinez.  The jury found Ayala guilty and sentenced him
to thirty-five years’ imprisonment.  On
appeal, Ayala contends (1) the trial court erred in denying his motion to
suppress evidence seized after his warrantless arrest, (2) the evidence is
legally insufficient to sustain his conviction, and (3) the trial court erred
in denying his motion for continuance, thereby denying him effective assistance
of counsel.  We affirm.

Background

          Ayala’s
brother, Morelos Ayala, testified that in February 2004, Ayala and Morelos
repaired their parents’ back patio. 
Afterward, they went to shoot pool. 
After playing pool, the brothers returned to their parents’ house, and Martinez,
the decedent, arrived ten minutes later. 
At about 8:00 p.m. or 8:30 p.m., Morelos went home to his wife and
children.  Ayala called Morelos around
11:00 p.m., 1:00 a.m., and 2:00 a.m. to ask whether he would come out drinking.  Morelos heard Martinez’s
voice in the background the second time, and actually spoke on the phone with
him during the third telephone call. 
Morelos told Ayala and Martinez that he did not
wish to go.  Morelos testified that it
sounded as if the two men were in a bar, and that by the third phone call, the
men sounded intoxicated.  Around 3:30
a.m. or 4:00 a.m., Ayala knocked on Morelos’s door and asked whether he could
park his truck in Morelos’s garage. 
Ayala wore a black jacket and blue jeans.  Morelos removed his truck from the garage and
allowed Ayala to park his truck in the garage. 
Ayala told Morelos that someone had shot “Javier” and thrown him in a
ditch somewhere.  Morelos observed a red
stain on Ayala’s truck seat, and told Ayala to do what he needed to do and
leave.  Ayala stated that he planned to
clean his truck and leave.  When Ayala
finished cleaning his truck, he told his brother not to tell anyone about the
incident.  

A couple of days later, Ayala asked
Ray Camorena, his cousin, to accompany him to several bars in Houston to look for a cellular phone that he
had lost.  Camorena testified that Ayala
had procured a job for Martinez at San Jacinto
Stone Company, and that Ayala and Martinez
were good friends.  

Six days after Martinez’s disappearance, Pearland
Police Officer John Albin discovered Martinez’s body in a
water-filled ditch on the side of the road. 
Near the body, Albin also discovered a wallet with Martinez’s identification, and a cellular
phone that belonged to Ayala according to the serial number and T-Mobile phone
records.  Crime Scene Investigator Ricky
Bort testified that someone had hand-pulled grass and thrown it on top of the
body in an attempt to obstruct a view of it. 
Investigators also found a shoe print next to Martinez’s
body.  Bort ran no tests on Martinez’s
hands to determine whether he had fired a gun. 
He testified that no attempts were made to remove fingerprints from the
wallet and cellular phone recovered at the scene.    

Four days after discovering Martinez’s body,
Detectives Cecil Arnold and Rene Alvarado spoke with several of Ayala’s family
members.  Detective Alvarado testified that
Ayala’s father, Ramiro Ayala, told him Ayala had shot Martinez
in self-defense.  Ramiro testified at
trial, however, that he never discussed what happened to Martinez
with Ayala, and that Ayala never told him he had shot Martinez in self-defense.  Catalina Ayala, Ayala’s mother, testified
that she did not have a conversation with Ayala in February or March 2004
regarding Martinez’s
death.  Specifically, Catalina testified
that she did not tell Morelos that Ayala had told her he had shot Martinez
in self-defense.  Morelos also testified
that Ayala never told him he had shot Martinez
in self-defense.  

Arnold testified, however, that when he
spoke with Morelos in front of Ayala’s parents’ house, Morelos seemed anxious
and looked repeatedly back towards the house. 
Morelos told him that he recognized the phone discovered next to Martinez’s
body as Ayala’s phone.  

After obtaining a statement from
Morelos, Arnold and Alvarado went to Alamo Stone Company to look for
Ayala.  Arnold believed Ayala to drive a green
Ford F-150 truck, and upon seeing one parked in front of Alamo Stone, Arnold
confirmed with police dispatch that the vehicle was registered to Ayala.  

Alvarado approached Ayala in the
lunchroom of Alamo Stone.  Alvarado
testified that he immediately placed Ayala under arrest.  Ayala did not seem nervous and was very
cooperative.  Arnold and Alvarado asked
for consent to search Ayala’s vehicle. 
Alvarado explained the voluntary consent to search form to Ayala in
English and Spanish.  Arnold
testified that he spoke to Ayala in English, and Ayala appeared to understand
what he said.  Ayala stood behind Arnold
as he searched the vehicle.  When Arnold opened the driver’s
side door, he observed a new cellular phone and cellular phone box, as well as
a blanket covering the seat.  Arnold
removed the blanket and observed what he believed to be a bloodstain on the
seat.  Arnold called the District Attorney and based
on that conversation seized Ayala’s truck as evidence.  Arnold testified that it
was at this point that he arrested Ayala.  

The investigators then took Ayala to
his home.  Arnold asked Ayala what he wore the
night of Martinez’s
murder, and Ayala told him a black leather jacket that Arnold
discovered on the floor of Ayala’s bedroom. 
Arnold
noticed a lot of mud on the lower part of the jacket, and what he believed to
be a bloodstain on the right sleeve.  Arnold and Bort testified that
no one conducted tests to determine if the mud discovered on Ayala’s jacket
matched the mud at the crime scene.  Arnold
conceded that it would be possible for Ayala to get mud on his jacket at work
because he worked at a stone company.  Arnold also discovered a
black semiautomatic SIG Sauer handgun, a nine millimeter spent shell casing,
two boxes of nine millimeter ammunition, and two bags of hollow point bullets.  Arnold
testified that when he opened the handgun, which was a .40 caliber, the nine
millimeter shell casing fell out of it.  Bort
testified that ballistics determined that the gun recovered from Ayala’s
apartment was not the murder weapon.  Arnold also discovered plastic cellular phone packaging
bearing the same model number as the cellular phone he had discovered next to Martinez’s body, and
several suitcases filled with clothes.  

 
Police retained Ayala’s vehicle at the police department until they
obtained a search warrant, at which point Bort examined the truck.  Bort photographed a bloodstain in the middle
of the bench seat and obtained samples from the stain.  Bort also obtained samples of blood spatter
from the passenger’s side door and from the floor around the gearshift.  He also removed the headliner, the visors,
and the dome light assembly, all of which contained blood spatter.    

At trial, Bort testified that he
compared the shoe impression he had discovered next to Martinez’s
body with both Martinez’s
and Ayala’s shoes.  Bort testified that
he believed that the cast matched the shape and size of the shoes recovered
from Ayala’s apartment, but he admitted that he is not an expert in making such
comparisons, and the cast was not sent to an expert because it was a poor
sample.  

          Christy
Smejkel, a criminalist for the Texas Department of Public Safety, determined
that Martinez’s
DNA matched the blood found on Ayala’s jacket, and on the seat and floor of his
vehicle.  She determined that one of the
bloodstains from the seat, and the stain from the floor of Ayala’s truck,
contained the DNA of multiple people, but that in both instances, Martinez’s DNA was
present.

          Dr.
Steven Pustillnik, the medical examiner who performed the autopsy on Martinez’s
body, testified that the only external injury to Martinez
was a bullet hole to the neck.  He
testified that the bullet entered through the soft tissue on the left side of
the neck, striking the vertebral column and the base of the skull, and ending
up next to the jaw on the right side of the head.  Dr. Pustillnik recovered the bullet, which
was a hollow point that had been filled with wax to ensure it would expand when
it struck its target.  He explained that
stippling, or small abrasions on the skin caused by powder and other particles
traveling with the bullet and striking the skin, occurs when a gunshot wound is
inflicted from two inches to twenty-four inches away, which is considered an
intermediate range wound.  Marginal
abrasions, or abrasions caused by the skin rubbing against the bullet, appear
when a gunshot wound is inflicted from twenty-four inches away or more, which
is called distant range.  Dr. Pustillnik
testified that he believed it was unlikely that Martinez shot himself because the gunshot
likely came from two feet away or more.  

          Darrell
Stein, the State’s firearms expert, testified that Bort gave him a .40 caliber
Smith & Wesson SIG arms pistol, a magazine, one spent cartridge case, and
some unfired cartridges to analyze. 
Stein determined that the spent cartridge was not fired from the pistol.  The cartridge was .38 caliber, consistent
with a nine millimeter Luger, but could also have been fired from a .38 Special
or a .357 Magnum.  Some of the unfired
cartridges discovered in Ayala’s apartment were nine millimeter hollow point
Luger bullets.  

          Morelos
testified that Martinez, who was in his late forties, had made comments in the
past that Ayala’s seventeen-year-old sister was “hot” and “sexy,”  and that Martinez would “talk a whole bunch
of stuff” when he was drunk.  Martinez’s comments would
offend everyone, and people would tell him to stop saying those things.  Morelos testified that Ayala had procured a
job for Martinez at Alamo Stone Company, and that
Martinez
sometimes carried a semiautomatic gun. 
Morelos testified that he had seen Ayala with two guns, but not on the
night of Martinez’s
murder.  

 

Motion to Suppress

In his first issue, Ayala contends
the trial court erred in denying his motion to suppress because the evidence
recovered from his truck was the fruit of his illegal arrest.  Specifically, Ayala contends the taint of the
illegal arrest was not sufficiently attenuated to permit the introduction of
evidence discovered following Ayala’s consent to search his vehicle and
apartment.  The State responds that the
evidence at trial shows consent to search was voluntary and any taint of an
illegal arrest dissipated.  We agree.

          Facts

          Four
days after the discovery of Martinez’s
body, Detectives Alvarado and Arnold went to Ayala’s place of employment, Alamo
Stone Company.  The detectives located
Ayala’s truck in the parking lot, and parked their police car directly behind
it, in order to block it from leaving.  Alvarado
then went to locate Ayala.  

Alvarado and Arnold both testified
that, before searching Ayala’s truck, Alvarado asked Ayala for permission to
search his truck and apartment and read the consent form in both English and
Spanish.  Ayala agreed to allow the
detectives to search both areas and signed the consent form.  Ayala was not handcuffed at this point in
time and the detectives allowed Ayala to stand behind them while they searched
his truck.  

Alvarado and Arnold then traveled
with Ayala to search his apartment. 
Ayala helped the detectives locate certain items and appeared to
understand what was going on at all times. 
Ayala never withdrew consent to search his truck or apartment at any
time. 

The record contains conflicting
testimony from the detectives as to when Ayala was placed under arrest.  Alvarado testified that immediately after
Ayala stepped out of the building, he informed Ayala, in Spanish, that he was
under arrest for the investigation of the homicide of Javier Martinez.  Alvarado testified that he then read Ayala
his Miranda rights[1] and
asked him if he would give the detectives consent to search his vehicle and
apartment, also in Spanish.  Arnold, however, testified
that Alvarado’s statement is incorrect, and that Ayala was not under arrest
when he came out of the building. 
Instead, Arnold testified that he himself did not place Ayala under
arrest until he obtained Assistant District Attorney Keith Allen’s
authorization to do so, which was after they searched Ayala’s truck, with his
consent, and found what appeared to be bloodstains.  The trial court ultimately found the arrest
to be warrantless and illegal since it did not meet any of the exceptions for a
warrantless arrest.  The trial court,
however, found by clear and convincing evidence that the police did not obtain
Ayala’s consent to search by exploitation of the illegal arrest, and denied
Ayala’s motion to suppress because the taint from the illegality was
sufficiently attenuated.  The trial court
found the consent was voluntary because there was a sufficient attenuation of
the taint.  Viewing the evidence in a
light most favorable to the trial court’s ruling, we conclude that the court
implicitly found that Ayala was placed under arrest before he gave his consent
to search, as Alvarado testified, rather than after the search, as Arnold
testified. 

          Standard of Review

          We
apply a bifurcated standard of review to motions to suppress, giving almost
total deference to the trial court’s determination of historical facts, while
reviewing de novo the court’s application of the law.  Maxwell
v. State, 73 S.W.3d 278, 281 (Tex. Crim. App.
2002).  We defer to the trial court’s
rulings on “mixed questions of law and fact” if the “ultimate resolution of
those questions turns on an evaluation of credibility and demeanor.”  Loserth v. State, 963 S.W.2d 770, 772
(Tex. Crim. App. 1998).  In a motion to
suppress hearing, the trial court is the sole trier of fact and judge of the
credibility of the witnesses and the weight to be given to their
testimony.  State v. Ross, 32
S.W.3d 853, 855 (Tex.
Crim. App. 2000); Foster v. State, 101 S.W.3d 490, 495 (Tex. App.—Houston
[1st Dist.] 2002, no pet.).  Accordingly,
the trial court may believe or disbelieve all or any part of a witness’s
testimony, even if that testimony is not controverted.  Ross,
32 S.W.3d at 855.  If, as in this
case, the trial court files no findings of fact, we view the evidence in a
light most favorable to the ruling and will uphold the trial court’s ruling on
any theory of law supported by the evidence. 
See Sauceda v. State, 129 S.W.3d 116, 120 (Tex.
Crim. App. 2004).  

          Attenuation
of Taint

Ayala first contends the State is
barred from raising the theory of attenuation of taint for the first time on
appeal because the State did not present this theory to
the trial court.  The record,
however, indicates that the trial court addressed this theory at the
suppression hearing.  We therefore
analyze whether any taint from the illegal arrest was sufficiently attenuated.

When consent follows an illegal
arrest, courts examine whether the consent is tainted by the illegal police
conduct.  See, e.g., Brick v. State, 738 S.W.2d
676, 677–78 (Tex. Crim. App. 1987) (holding court of appeals erred in declining
to consider whether arrest was illegal and whether consent was tainted by
potentially illegal police activity). 
The primary purpose of determining whether consent is tainted is to ensure
that evidence that is the fruit of an unreasonable search or seizure by police
is not admissible in court.  Wong Sun
v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417 (1963) (when
evidence results from illegal actions of police, issue is “whether, granting
establishment of the primary illegality, the evidence to which instant
objection is made has come at by exploitation of that illegality or instead by
means sufficiently distinguishable to be purged of the primary taint”).  

The Court of Criminal Appeals in Brick
held that courts should apply the factors articulated in Brown v.
Illinois, 422 U.S. 590, 604–05, 95 S. Ct. 2254, 2262 (1975), including an
independent analysis of the voluntariness of the consent.  Brick, 738 S.W.2d at 679–81; see Boyle v. State, 820 S.W.2d
122, 131 (Tex. Crim. App. 1989), overruled
on other grounds, Gordon v. State, 801 S.W.2d 899, 911 n.13 (Tex.
Crim. App. 1990).  The court in Brick
held:

[B]efore it can be determined that evidence derived
from a warrantless but consensual search following an illegal arrest is
admissible, it must first be found, by clear and convincing evidence, not only
that consent was voluntarily rendered, but also that due consideration of
[certain] additional factors . . . militates in favor of the conclusion that
the taint otherwise inherent in the illegality of the arrest has dissipated.

 

738 S.W.2d at 681.  The burden of showing attenuation and thus
admissibility rests with the State.  Id.  

 

Voluntariness of Consent

          When
relying upon consent to justify the lawfulness of a search, the State has the
burden to prove by clear and convincing evidence that the consent was freely
and voluntarily given.  Bumper v. N.
Carolina, 391 U.S.
543, 548, 88 S. Ct. 1788, 1791 (1968); see also Corea v. State, 52
S.W.3d 311, 317 (Tex. App.—Houston [1st Dist.] 2001,
pet. ref’d).  The burden requires the
State to show that the consent was positive and unequivocal, and without duress
or coercion.  Meeks v. State, 692
S.W.2d 504, 509 (Tex. Crim. App. 1985); Riordan v. State, 905 S.W.2d
765, 770 (Tex. App.—Austin 1995, no pet.). 
The burden cannot be discharged by showing no more than acquiescence to
a claim of lawful authority.  See
Bumper, 391 U.S.
at 548–49, 88 S. Ct.
at 1791­–92.  The validity of consent to search is
a question of fact to be determined from all the circumstances.  Rayford
v. State, 125 S.W.3d 521, 528 (Tex.
Crim. App. 2003).

          Here, Detective Alvarado testified that he read Ayala his Miranda rights and requested consent to
search Ayala’s truck in both Spanish and English.  Alvarado did not handcuff Ayala or draw any
weapons, but instead walked with him to the truck to meet with Detective
Arnold.  Alvarado then translated the
voluntary consent to search form to Ayala in Spanish, explained that they were
asking to search both his truck and apartment, and noted that he had the right
to refuse to provide consent or could withdraw consent at any time.  Ayala signed the consent form and stood
behind the detectives as they searched his truck.  Although the record is not clear as to
exactly what point in time the detectives handcuffed Ayala, it is clear he was
not handcuffed before he signed the consent form nor while he observed the
detectives search his truck.  Ayala fully
cooperated at all times, at one point even helping the detectives find certain
items at his apartment.

Additional Brick
Factors

The Court of Criminal Appeals in Brick
identified six factors to consider in determining whether consent to search
is purged of its primary taint: (1) the proximity of the consent to the arrest;
(2) whether the seizure brought about police observation of the particular
object which they sought consent to search, or, in other words, whether the
illegal arrest allowed officers to view the area or contraband that the
officers later received consent to search; (3) whether the illegal seizure was
flagrant police misconduct; (4) whether the consent was volunteered, rather
than requested by the detaining officers; (5) whether the arrestee was made
fully aware of the fact that he could decline consent and, thus, prevent an
immediate search; and (6) whether the police purpose underlying the illegality
was to obtain the consent.  738 S.W.2d at
680–81; Beaver v. State, 106 S.W.3d 243, 250 (Tex. App.—Houston
[1st Dist.] 2003, pet. ref’d).

          Here,
the first factor, the proximity of the consent to the arrest, tends to favor
suppression of the evidence because the record indicates Ayala’s consent to
search his truck and apartment immediately followed his arrest by Detective
Alvarado.  Temporal proximity, however,
is not a strong determining factor, and courts have generally analyzed it in
light of the flagrancy of police misconduct and any intervening circumstances
occurring between the time the officers began the unlawful detention of the
appellant and appellant’s giving of consent. 
Boyle, 820 S.W.2d at 132. 

With regard to the second factor, Ayala’s
unlawful arrest did not bring about the detectives’ observation of his
truck.  Rather, the detectives already
had identified the truck as belonging to Ayala. 
Moreover, the detectives did not search the truck pursuant to the
arrest, but rather obtained consent first. 
The arrest therefore did not bring about observation of the truck.  This factor favors the State.

The third factor is whether the illegal
seizure was flagrant police misconduct. 
Courts typically do not deem police misconduct as “flagrant” unless the
police engaged in the conduct for the purpose of obtaining consent, or to cause
surprise or fear.  Beaver, 106
S.W.3d at 250–51.  The record indicates
that the detectives thought they had probable cause to question Ayala regarding
the investigation after they found Ayala’s cellular phone near Martinez’s body and spoke
with Morelos.  The detectives’ misconduct
thus was likely not for the purpose of obtaining Ayala’s consent to search his
truck.  Additionally, nothing in the record
demonstrates that the misconduct was calculated to cause surprise or fear.  There is no evidence in the record of threats
or coercion by the detectives.  On the
contrary, Ayala was not handcuffed when he was arrested or while the detectives
searched his truck.  Furthermore, Alvarado
read Ayala’s Miranda rights to him in
Spanish, as well as translated the consent form into Spanish.  The detectives also testified that they were
able to speak to Ayala in English, and that Ayala seemed to be cooperative and
understood what was going on at all times. 
The record does not show that the detectives’ conduct was purposefully
flagrant; thus, this factor weighs in favor of the State.

The fourth factor favors Ayala
because the police requested that he consent to allow them to search his truck
and apartment—he did not volunteer it. 

Ayala was made fully aware of the
fact that he could decline consent and prevent an immediate search, which
weighs in favor of the State under the fifth Brick factor.  The record reflects that Alvarado asked Ayala
in both languages if he would consent to the search and sign the form.  The detective also informed Ayala that he had
the right to refuse to give consent to search his property.  Ayala appeared to understand the request, and
he seemed cooperative at all times.  

Finally, the sixth factor examines
whether the police purpose underlying the illegality was to obtain
consent.  The record reveals that the
detectives thought they had probable cause to question Ayala regarding the investigation
into Martinez’s
death.  Regarding the arrest, however,
the trial court noted that “instead of a police purpose underlying [the]
illegality . . . [the officers] had a difference of opinion, more or
less.”  Alvarado thought Ayala was under
arrest before they requested his consent to search, whereas Arnold thought Ayala was not under arrest
until after they searched his truck.  The
record does not indicate whether there was any improper police purpose
underlying the illegality.  This factor
does not clearly favor either Ayala or the State.

Viewing the record and all reasonable inferences
in the light most favorable to the trial court’s ruling, we find the consent to
search was sufficiently purged of its primary taint.  Accordingly, we conclude that Ayala’s consent to search was
voluntary and that any taint of the illegal arrest was sufficiently attenuated.[2] 

 Legal Sufficiency

          In
his third issue, Ayala contends the evidence is legally insufficient to support
his murder conviction because the circumstantial evidence fails to demonstrate
that Ayala fired the shot that killed Martinez.

          Standard
of Review

When evaluating the legal sufficiency
of the evidence, we view the evidence in the light most favorable to the
verdict and determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S.
307, 319, 99 S. Ct. 2781, 2789 (1979); Drichas v. State, 175 S.W.3d 795,
798 (Tex.
Crim. App. 2005).  The standard is the
same for both direct and circumstantial evidence cases.  Kutzner v. State, 994 S.W.2d 180, 184
(Tex. Crim. App. 1999).  We do not
resolve any conflict of fact, weigh any evidence, or evaluate the credibility
of any witnesses, as this is the function of the trier of fact.  See Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App.
1999); Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App.
1992); Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991).  Instead, our duty is to determine whether
both the explicit and implicit findings of the trier of fact are rational by
viewing all the evidence admitted at trial in the light most favorable to the
verdict.  Adelman, 828 S.W.2d at
421–22.  In so doing, any inconsistencies
in the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.  In circumstantial evidence cases such as
this, it is unnecessary for every fact to point directly and independently to
appellant’s guilt; it is enough if the combined and cumulative force of all the
incriminating circumstances warrants the conclusion.  See Johnson v. State, 871 S.W.2d 183,
186 (Tex. Crim. App. 1993); Russell v. State, 665 S.W.2d 771, 776 (Tex. Crim. App. 1983).  

          Analysis

          A person commits the offense of
murder if he “intentionally or knowingly causes the death of an individual” or
he “intends to cause serious bodily injury and commits an act clearly dangerous
to human life that causes the death of an individual.”  Tex.
Pen. Code Ann. § 19.02(b)(1)–(2) (Vernon 2003).   

          Ayala
contends this case is similar to Clayton v. State, in which the Corpus
Christi Court of Appeals found evidence legally insufficient to sustain a
murder conviction where the evidence failed to demonstrate that the appellant
fired the bullet that killed the victim. 
169 S.W.3d 254, 258 (Tex. App.—Corpus Christi 2005, pet. granted).  This case is distinguishable from Clayton,
however, because in Clayton, there was no evidence of motive or of
appellant’s presence at the scene before the commission of the crime.  In Clayton,
the victim was discovered shot multiple times, lying in a field next to a
wrecked car full of blood.  Id.
at 256.  Appellant’s transfer
fingerprints, where appellant had touched the victim’s blood and then touched
the car, were discovered on the steering wheel and on the gearshift.  Id.  The State provided no motive, and appellant
testified that he had arrived after the incident, attempted to drive the victim
in the wrecked car to get help, and was frightened away by an oncoming truck,
which crashed in a ditch near the scene. 
Id.
at 256–57.  

Here, Morelos testified that, on the
evening of the incident, he saw Martinez
and Ayala together at his parents’ house, and subsequently received phone calls
from Ayala’s phone, from both Ayala and Martinez, asking him to
come drinking with them.  More importantly,
Morelos testified that Ayala showed up at his house early the next morning
asking to use Morelos’s garage to clean his truck because someone had shot Martinez
and left him in a ditch.  Morelos also
testified that, in the past, Martinez,
a middle-aged man, had made inappropriate comments about Ayala’s teenage sister
while he was drunk that had made Ayala angry. 
Thus, the State in this case presented evidence both that Ayala was with
Martinez
prior to the incident, and that he had a potential motive for murdering
him.  In addition, the State presented
evidence that police officers discovered Martinez’s blood in Ayala’s
truck and on the jacket Ayala claimed to have worn the evening of the
murder.  The same jacket was muddy, as
were the shoes Ayala claims to have worn that evening.  Police officers discovered Ayala’s cellular
phone next to Martinez’s
body, which was lying in a ditch and covered with pulled grass.  Police discovered hollow point bullets and
ammunition in Ayala’s apartment consistent with the bullet removed from Martinez’s
body.  Viewed in a light most favorable
to the verdict, we conclude that this evidence is legally sufficient to sustain
Ayala’s conviction.

Motion for Continuance

          In
his second issue, Ayala contends the trial court abused its discretion by
denying his motion for continuance because it denied him effective assistance
of counsel.  Specifically, Ayala contends
that although he was allowed to test the victim’s DNA found on his shoes, he
was not given sufficient time to test other DNA evidence that the State
discovered on his shoes, which he contends could potentially have been
exculpatory.  The State responds that
Ayala has failed to preserve error on this issue.  We agree.

Article 29.03 of the Texas Code of
Criminal Procedure requires that a motion for continuance be in writing, and
sworn to by a person having personal knowledge of the facts relied on for the
continuance.  See Tex. Code Crim. Proc. Ann. art. 29.03 (Vernon
1989).  Moreover, the Texas Court of
Criminal Appeals has held that “[a] motion for continuance not in writing and
not sworn preserves nothing for review.” 
Dewberry v. State, 4
S.W.3d 735, 755 (Tex.
Crim. App. 1999).  Here, Ayala
presented two unsworn motions for continuance, and has therefore failed to
preserve error with respect to the motions on appeal.  Id.[3] 

Even if we construe this issue as a
complaint that Ayala was denied effective assistance of counsel because his
attorney failed to file a sworn motion for continuance, we do not believe that
Ayala has satisfied the second prong of Strickland.
 Strickland
v. Washington, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052,
2064, 2068 (1984).  To show ineffective assistance of counsel, a defendant must demonstrate
both (1) that his counsel’s performance fell below an objective standard of
reasonableness, and (2) that there is a reasonable probability that, but for
counsel’s unprofessional errors, the result of the proceeding would have been
different.  Id. at 687–88, 694, 104 S.
Ct. at 2064, 2068; Andrews v. State, 159 S.W.3d 98, 101 (Tex. Crim. App.
2005).  A defendant has the burden to
establish both of these prongs by a preponderance of the evidence, and a
failure to make either showing defeats his ineffectiveness claim.  Andrews, 159 S.W.3d at 101; Mitchell v. State, 68 S.W.3d 640, 642 (Tex.
Crim. App. 2002).  We presume that
counsel’s conduct falls within the wide range of reasonable professional
assistance, and we will find counsel’s performance deficient only if the
conduct is so outrageous that no competent attorney would have engaged in
it.  Andrews, 159 S.W.3d at 101.  We cannot speculate beyond the record
provided, so any allegation of ineffectiveness must be firmly founded in the
record, and the record affirmatively must demonstrate the alleged
ineffectiveness.  Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App.
1999).

A trial court’s decision
to grant or deny a motion for continuance is discretionary. 
Heiselbetz
v. State, 906 S.W.2d 500, 511 (Tex. Crim.
App. 1995).  To find an abuse of
discretion in refusing to grant a motion for continuance, there must be a
showing that the defendant was prejudiced by his counsel’s inadequate
preparation time.  Id.  Here,
Ayala contends that he was prejudiced because although he was allowed to
test the victim’s DNA found on his shoes, he was not given sufficient time to
test other DNA evidence that the State discovered on his shoes, which he
contends could potentially have been exculpatory.  

If a third party actually committed
the murder in this case and somehow left DNA on Ayala’s own shoes during the
crime, then Ayala should know of his identity and could have had him subpoenaed
for trial.  See Perez v. State, 5 S.W.3d 398, 400–01
(Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding appellant did not
satisfy Strickland test when
appellant demonstrated a complete lack of diligence by failing to timely disclose
factual information to trial counsel). 
Ayala has also failed to demonstrate how the existence of the third
party’s DNA on his shoes could overcome the evidence against him.  Ayala thus has not shown that a reasonable
probability exists that, but for counsel’s unprofessional errors, the result of
the proceeding would have been different. 
See Andrews, 159
S.W.3d at 101.  Accordingly, we hold that
Ayala was not denied effective assistance of counsel.

Conclusion

We conclude that (1) the trial court
did not err in denying Ayala’s motion to suppress evidence seized after his
warrantless arrest, (2) the evidence is legally sufficient to sustain Ayala’s
conviction, (3) Ayala failed to preserve error regarding the trial court’s
denial of his motion for continuance, and (4) Ayala was not denied effective
assistance of counsel.  We therefore affirm
the judgment of the trial court.

 


                                                          Jane Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Alcala and Bland.

Do not publish.  Tex.
R. App. P. 47.2(b).











[1] Miranda v. Arizona, 384 U.S.
436, 479, 86 S. Ct.
1602, 1630 (1966); see also Tex. Code Crim. Proc. Ann. art. 38.22,
§ 2 (Vernon 2005).





[2] Because we conclude that Ayala’s consent renders the
search of his vehicle and apartment valid, we need not address the issue of
whether his arrest was authorized under the Code of Criminal Procedure, or
whether the officers had jurisdiction to make the arrest.





[3] We note that this court and others have held that a
motion for continuance that does not comply with the Code of Criminal Procedure
may nonetheless be reviewed for abuse of discretion if denial of the motion for
continuance amounts to a denial of the rudiments of due process.  See, e.g., Williams v. State, 196 S.W.3d 365, 367 (Tex. App.—Houston [1st Dist.] 2006,
no pet.); O’Rarden v. State, 777 S.W.2d 455, 459–60 (Tex. App.—Dallas
1989, pet. ref’d).  Ayala does not argue,
however, that such a review is warranted in this case.